## SPARKS MILLING CO. v. UNITED STATES.

### No. 18648.

District Court, E. D. Louisiana.

Nov. 3, 1933.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley, of New York City, Dart & Dart, of New Orleans, La., and Henry P. Dart, Jr., of New Orleans, La., of counsel), for libelant.

Edouard F. Henriques, Sp. Asst. to U. S. Atty., and William I. Connelly, Atty. to United States Shipping Board, both of New Orleans, La., for the United States.

BORAH, District Judge.

This libel filed under the Suits in Admiralty Act approved March 9, 1920 (46 USCA §§ 741–752), seeks a recovery against the United States of America for the damage sustained to a shipment of flour which was received on board the steamship Afel at the port of New Orleans during the month of September, 1926, for carriage to the port of Santos, Brazil.

The bills of lading which libelant offered in evidence acknowledge receipt of the flour in apparent good order and condition, and it is conceded by respondent that upon discharge at Santos the flour which was stowed in No. 2 hold was damaged by sea water. Such being the situation, the burden lies upon the respondent to show, not only the cause of the damage, but that the cause is within a valid bill of lading exception or statutory exemption from liability, otherwise respondent's liability as an insurer against all losses is established. It follows that if the cause of the damage is left in doubt, that doubt must be resolved against the carrier. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

The respondent pleads exemption from liability under the Harter Act (46 USCA §§ 190–195) and the general exemption clauses of the bill of lading covering the damaged cargo. It is quite clear, however, from the pleadings and the testimony, that the respondent's main defense is predicated upon the contention that the Afel, while made fast with her starboard side alongside the Oil Company's Quay at the port of Pernambuco, collided with and ranged against a submerged concrete ledge extending from the wall of said quay. The alternative defense of heavy weather finds no support in the testimony, hence need not be considered.

The Afel, a comparatively new vessel, was built for the respondent by the American Shipbuilding Corporation at Hog Island, Pa., and upon completion in August, 1919, was given the highest possible rating

accorded to vessels classified under the regulations of the American Bureau of Shipping. Thereafter she was placed in operation and first comes into this case on April 23, 1926, when she was brought from temporary lay up to Pier 11, Staten Island, N. Y., where she was taken for the purpose of being placed in readiness for immediate operation. The vessel was then thoroughly inspected and surveyed and thereafter for a period in excess of four months, part of which time was spent in dry dock, she remained in that vicinity undergoing repairs under the observation and inspection of surveyors representing the American Bureau of Shipping, the United States Local Inspectors, and the technical representatives of the Shipping Board. During this period the Afel also passed her annual inspection under the supervision of the steamboat inspectors at New York, and a certificate of inspection certifying as to her fitness was issued. Having completed these extensive repairs involving an expenditure of $30,000, in addition to other work necessary to place the Afel in first-class condition, the vessel was on August 31, 1926, accepted by the Mississippi Shipping Company from the Shipping Board after inspection by its agents and the ship's officers. With a competent personnel in charge the Afel sailed for New Orleans on September 1, 1926. She completed this voyage in eight days, and though light and encountering variable winds blowing at forces three and four, there was no evidence upon arrival at New Orleans of any defects or deficiencies in either her riveting or shell plating. Before loading commenced, she was again inspected by the port captain of the Mississippi Shipping Company, who was accompanied at all times by either the master or chief officer and two or three members of the crew. The inspection was a thorough one and covered every available portion of the ship. At each hold the ceiling was lifted to see if any cargo was deposited underneath; a number of the bilge boards were lifted and the tank tops and ship's sides were inspected for leaking rivets or corrosion. The manhole plates were removed and the cofferdams inspected, and the sheathing was removed from the strainers and the sounding pipes to facilitate their inspection in the holds; in fact, the inspection was such as to reflect the condition of the Afel in each hold, and nothing was observed to indicate that the vessel was not fit and seaworthy for the contemplated voyage. The Afel was likewise inspected by the surveyor to the New York Board of Underwriters. The purpose of this inspection

was to ascertain if the ship's holds were clean and in proper condition to receive cargo, and if cargo was properly stowed, handled, and dunnaged. Finding no defects in the vessel's fittings or equipment and nothing to criticize or disapprove, the surveyor issued a certificate showing full compliance with the rules of the New York Board of Underwriters.

When all the cargo at New Orleans was loaded, including the flour involved in this action, the Afel sailed for Port Arthur, Tex., where she took on additional cargo for South American ports, including 9,000 bags of flour which were laden in No. 2 lower hold. Loading completed, she sailed for Pernambuco, Brazil, the first port of call, arriving thereat on the afternoon of October 22, 1926. During the twenty-two days that were consumed in making this passage, the vessel encountered no unseasonable weather and the voyage was wholly without incident save for a minor detention to plug fourteen tubes in the main condenser. On this voyage soundings were made twice a day to inform the ship's officers of the conditions presented in the holds, and the record of the soundings is persuasive that no water was discovered in the No. 2 cofferdam during the course of the voyage from New York to New Orleans, and from New Orleans to Pernambuco.

Upon arrival at Pernambuco the Afel was taken in charge by a compulsory pilot and moored with her starboard side along the concrete quay at the south end of what is variously termed Warehouse No. 1, the Oil Company's Quay, or the Inflammable Warehouse. As the pilot brought her in, the vessel approached the dock at a slight angle and lightly touched her bow against the quay wall at a point well forward of the area where damaged rivets were eventually discovered. A line was then put out on the starboard bow and the ship hove alongside. Upon approaching the dock a stern line was put out aft and the vessel hauled alongside, after which she was breasted off between two and three feet from the top of the wall of the quay by using the ship's port anchor forward and a kedge anchor aft with thirty fathoms of chain on each, and mooring lines ashore.

On the following morning the Afel commenced discharging cargo, and shortly thereafter soundings were made and thirty inches of water was found in the bilge of No. 2 hold. This condition was reported to the ship's officers and orders were given to pump

the bilge well dry. This order was immediately carried out, and the bilge water as it came from the pumps was observed and it showed no trace of discoloration. The chief officer in an effort to diagnose the trouble inspected the No. 2 hold but found no visible trace of water. Confronted with this situation, the master instructed the chief officer to make soundings around the vessel and alongside the dock. This was done, and the soundings revealed that the Afel which was then drawing 20'10" forward and 24'2" aft had sufficient water under her bottom, but the presence of an unknown ledge was discovered protruding 18 inches from the face of the quay at a depth of 21 feet from the water surface.

From the time that water was first discovered in No. 2 bilge the Afel continued to make water and she was sounded and pumped out at frequent intervals. While the inflow of water in No. 2 cofferdam at times was at the rate of five inches per hour, it did decrease to the point where soundings and pumping were conducted only at two hour intervals. On the fifth day after arrival, discharge at Pernambuco was completed and the Afel proceeded to the port of Rio de Janeiro. During the five days which were consumed in making this passage, soundings consistently showed the presence of water in No. 2 hold and the vessel was pumped at regular intervals; however, there were no traces of flour in the discharge to suggest that the bilge water had come in contact with the cargo. After a stay in port of approximately six days, the Afel set sail for the port of Santos where she arrived on November 7, 1926. Discharging was commenced on the following day and periodical soundings and pumping continued with no indication that water had at any time reached the cargo until on November 13th, when forty-eight inches of water was discovered in No. 2 cofferdam and which when pumped out showed a decided trace of flour. Upon this showing the discharge of the cargo in No. 2 hold was commenced and continued night and day without interruption. After working down in the hold it was discovered that at some time during the voyage water had entered this hold and eight feet of cargo had sustained damage. When all the cargo was discharged it was found that approximately twenty-one rivets on the starboard side of No. 2 hold were leaking badly and approximately twenty rivets were leaking slightly. A survey was thereupon called, temporary repairs which included replacement of the damaged rivets were carried out as recommended, and the vessel returned to New Orleans, where she was put in dry dock. There it was discovered that the vessel had scrubbed against some apparently irregular object at each of the places on the starboard side of the ship at No. 2 hold where temporary repairs had been made. It was found that the plating on the butts was shredded and scored and the rivets scored below the edge of the plate, and that the paint and barnacles had been scraped off alongside of where these rivets had been replaced in Santos, and that the plates in this locality were set in.

The testimony in this case establishes the fact that the Afel was moored with her No. 2 hold about opposite the No. 10 door at the southern end of Warehouse No. 1; that Warehouse No. 1 is about opposite the entrance through the breakwater and that because of the seasonable trade winds which were prevalent there was an unceasing swell against the wall of the quay. It further appears that the effect of a southeast wind when accompanied by an ebb tide is calculated to lessen the tension on the anchor chains and cause a vessel to range against the quay wall where, as here, the vessel was only breasted off two or three feet from the top of the wall. The testimony in this case further shows that the construction of the quay wall was such that it tapered out or slanted down from the top towards the base, and the preponderance of the evidence clearly establishes the existence of concealed ledges which could have touched the Afel in the way of No. 2 hold. The respondent has produced twenty-eight witnesses who have testified as to the existence of these projections, three of whom were professional divers, and while there is testimony to the contrary, the proof carries conviction of the existence of a ledge twenty-seven feet from the top of the dock which projected out from the face of the quay a distance of approximately twenty-two inches.

While it is true that the ship's officers have testified that they had no knowledge of the ship ranging against the quay after she was breasted off, and while it is conceded that the impact which occurred while the ship was being kedged in to the quay did not and could not have caused the damage, the probabilities nevertheless favor the view that the Afel did range against the projecting ledge which was in such close proximity to the point where the damage actually occurred. Furthermore, the character and nature of the damage is mute evidence that the injury to the vessel was sustained in the

manner claimed. However, if there can be any doubt on the subject, this doubt is removed when the testimony of the boatswain is considered. This witness stated that he went ashore the night that the vessel arrived at Pernambuco but came on board at 5 o'clock the next morning; that he observed a swell inside of the breakwater and the vessel was surging in and he felt her shiver four or five times as though she were hitting the dock, and he thought the ship was being damaged and reported the fact to the chief engineer. I have been asked to disregard the testimony of this witness because of the imputations that are to be drawn from the circumstance that he was ashore all night and because the chief engineer, whose testimony was taken nearly three years thereafter, had no recollection of this incident having been reported to him. There appears, however, no justification for my doing so. The mere fact that the boatswain accepted the language of counsel and described the ship as shivering casts no suspicion on his testimony; in fact, that is the sensation one would expect to feel if the vessel was striking against the ledge.

Since it is admitted that the cargo was damaged by sea water, and satisfactory proof has been offered to show the cause of its presence, and that the damage was occasioned by a peril of the sea, a cause for which the vessel was exempt from liability, and since libelant has failed to offer any proof to establish that the damage might have been prevented by reasonable skill and diligence on the part of the carrier, the only inquiry open is whether the carrier has furnished a seaworthy vessel or exercised due diligence to that end.

The libelant does not seriously contend that the Afel's underwater body, shell plating, and riveting were not thoroughly inspected when the vessel was in dry dock, nor does it concede the fact; it rather takes the position that the conditions found at the time of dry docking are irrelevant, and there is force in the contention because it does seem logical to assume that the rivets were damaged subsequent to the vessel's dry docking as she was painted at that time. Accordingly, it is contended that the history of the Afel prior to the commencement of the voyage throws the greatest suspicion on her, and it is pointed out that not only was she in a collision with the tugboat Bathalum, but that certain indentations were found in the plating on the starboard side of the ship when the master took over the command of the vessel at New York. The entry in the log-book under date of June 18th reads: " * * * Fords tug-boat Bathalum coming out of North side of Pier hit our Starboard quarter damage unknown as yet. Ford's tug boat's Port rigging carried and other damages to said boat. * * *" This entry indicates that the impact was abaft the ship's beam. Of course, this collision has no relation to the damage to the cargo in the No. 2 hold, and the same is true with reference to the indentations in her shell plating. This evidence was simply offered in an effort to show the lack of attention of which the respondent was guilty in preparing the Afel for her voyage. However, where as here all the direct evidence is to the effect that the vessel was seaworthy when she entered on her voyage, it cannot be inferred from these facts that her seaworthiness was thereby impaired in the absence of affirmative evidence that she was in fact injured thereby in her hull. Furthermore, the evidence in this case shows that the indentations which were in the ship at the time she was accepted by the Mississippi Shipping Company are still present without any repairs having been made thereto, thus negativing the contention that another official inspection should have been applied for.

Though the testimony is all one way that the vessel did not go aground or meet with any accident on the voyage, it was discovered upon dry docking at New Orleans that there was damage to the port side of the Afel in the way of No. 2 hold, and it is contended that this fact is significant in relation to the time when the rivets on both sides of the ship sustained damage. While one witness has testified to that effect, his testimony is admittedly speculative and he frankly admits that the damage could have come about from the vessel rubbing her port side against a dock at some time on the same voyage, and the testimony shows that the Afel did lay with her port side along the dock at Santos for a considerable time.

It is further contended that the libelant's flour was improperly stowed at New Orleans and that the stowage rendered the vessel unseaworthy. The issue thus presented is whether or not the stowage of the flour was negligent. Rather than prolong this opinion to undue length, it is sufficient to say that on this issue of fact I find that the preponderance of the evidence establishes beyond doubt that the stowage at New Orleans was eminently proper, and were it not for

the entry of water into the hold in sufficient volume to move the normal accumulation of flour dust lying upon the tank tops down to the strainers, there would have been no damage. In this connection attention is invited to clause 18 of the bill of lading, which provides: " * * * that the insurance surveyor's certificate shall be accepted by the holder of this bill of lading as conclusive evidence that the vessel has been properly prepared for the cargo in every way."

Upon the whole case it seems to me that the respondent has discharged the burden which the law imposes upon the owner and has shown that it exercised, not only due diligence to make the Afel fit and seaworthy, but that she was in fact seaworthy at the beginning of the voyage, and that the proximate cause of the loss was a peril of the sea; that is to say, it was an access of sea water through an accident to a seaworthy ship, arising from striking or surging against submerged projections or ledges which existed on the face of the quay wall at the port of Pernambuco. Respondent is therefore entitled to the protection which the Harter Act affords.

The libel will accordingly be dismissed, at the libelant's cost.